29152.   PARKER *v.* SOUTHERN RAILWAY COMPANY.

DECIDED OCTOBER 11, 1941.   REHEARING DENIED NOVEMBER 19, DECEMBER 4, 1941.

*Hewlett & Dennis, T. F. Bowden,* for plaintiff.

*Neely, Marshall & Greene, Edgar A. Neely Jr., W. Neal Baird,* for defendant.

FELTON, J. The person acting as yard conductor on the date of the injuries testified: "I saw the Southern car on that track. When we backed in there I picked it up and headed out. I coupled the rear of the engine to it. I backed up about 60 feet to the coal-chute track with this car, and we went into the coal chute with it. When we went into the coal-chute track we could see some cars on the coal-chute track. We could not tell what cars were on there. I don't recall whether I told my field man or my engine man the number of it. I found out what cars were on there. The car I went after (the Rock Island and a 'Frisco car), was on the coal-chute track. The car I wanted was the rear car. In other words the car that I did not want was the middle car. I went in there and coupled up those two cars. When I say the rear car, I mean the Rock Island car was the car we wanted, and it was near the end of the coal trestle and the 'Frisco car was on the end next to the house lead. We had no orders on the 'Frisco car. As to what is our practice where we don't have any orders, when we find a car on a siding connected in a cut of cars we want, well, we cut the car we want out of there and put the other cars back where we find them; we don't bother those cars unless we have orders to do so. I backed into the coal-chute track with the car that I had gotten from the cloth-room track, that was the Southern car, and headed back out the lead, and set one out; in other words, I shoved it out and cut it off. The car we wanted was a Rock Island car. We backed south on the lead and set it direct north on the main line. I headed back out the lead. My engine was headed south. We backed up and left the Rock Island car on the lead somewhere north of this coal-trestle switch. That put our engine next to the 'Frisco car. After we set this car out, I stayed there. We have to book these cars. We have to put them on the yard book. We have to get the number of the car and turn this book in at night for a yard record. That is what I was doing. And sometimes I have

known them to roll back there; they have a sort of slant, and they will roll back there. This track where this car was sitting is on a slant. I mean it has gravity; it is on a slant and you have to watch them or check them to keep them from rolling back; and I stayed with the Rock Island car and booked it while the others shoved this other car back into the coal-trestle track. The purpose of going back into the coal-trestle track was to carry this car that I had nothing on; to shove it back to the platform where we got it. I mean the 'Frisco. You see, I did not have anything on that. I do not know whether it was a load or empty. I shoved the 'Frisco car back onto the trestle track where I found it, and left it there. That movement from the switching of that 'Frisco car back on to the coal-trestle track was the movement in which Mr. Parker claims to have been injured. I did not see it. After the movement was completed the 'Frisco car was cut off and left at the end of the trestle track, and then the engine pulled out and headed south; headed back out with the Southern car.

"Well, we got out on the lead and Mr. Palmer, that was a switchman, signalled for me to come around and told me that Mr. Parker had fell, and I lit out around there as fast as I could go. Assuming that that is all over with and everything had happened, and get back to our next movement as we got in that trestle track, I pulled back out and got on the lead again. After that we caught the Rock Island car that we had kicked out with the Southern car and headed back down the lead. We coupled the Rock Island car with the Southern car, we had the Southern car coupled to the engine all the time, and after coupling with the Rock Island I carried them back to the yard and headed back across this same crossing that I came to when I went up there, and put them in No. 1 track in the yard. We have tracks numbers 1, 2, 3, 4, etc., and this No. 1 track is next to the southbound main line; and I cut the cars off and left them there and notified the yardmaster. I had nothing to do with putting them into a train. . . If I had gone and gotten that Southern car and I had not wanted to carry it around with me, in order to get hold of the Rock Island car, I would have had to make an extra switch and shove it towards the northbound and I would have had to shove it up there and cut it off and headed back down and backed in. We figure on time in switching, you see. That would have been quite a bit of extra

work to do that, extra switching. I could have gotten it and carried it down three quarters of a mile and come back. So much time would have been used I would not have got to have went back. It was necessary for me to couple on that Southern car in order for me to go on and get hold of the Rock Island car for my convenience. I could, if I had wanted to, have gone to the coal trestle and gotten my Rock Island car before I got the Southern car but we would have been running by work. We always take the work as we come to it. The first thing I come to I pick it up, and the Southern car was attached to the back of the engine during the switching movement of the Rock Island car. All this time we were switching the Rock Island car it was extra baggage or whatever you might call it. We think nothing about a movement like that with a switch engine. As I told you awhile ago, it saved me a switch there. If I had picked this car up and carried it there, I would have had to- back into the coal chute, and it saved me an extra movement there. That was not the only reason we backed in there and picked it up at that time. I did not know where the other cars were.

"As I told you, we get a list of cars at Poe Mill, and they don't tell us where to find those cars at. We have got to look for them, and it was dark and I had to hunt them and locate the cars and where they were. That was the only reason I went in there, was because it was the first car and it was the easiest thing to do. In making our switching movement, we frequently couple up with one, two, three or four or five cars. That is what we do with the switch engine; we get a cut of them and switch them off plumb on up until we cut the last one off. We just switch them off and cut the last one loose from the engine. If we had several cars to get at different places, we would accumulate those cars as we came to them. In working industries like that, if we accumulated big bunches of them, of course, naturally we would not try to go in no close places, or nothing like that, with a bunch of cars. It would be convenient to shove those cars out somewhere. If we don't have a big bunch of cars we frequently switch around with three or four attached to the engine. This map approximately represents the situation out there as to the tracks into Poe Mill. That is the main switching lead. That is the outside track, or the most westerly track of Poe Mill. The next two tracks are the northbound and the southbound. The next one to Poe Mill is the house-lead

track. This first track that runs off to the right from the house track is the cloth-room track that comes out from the house lead into the clothroom. The next track running off to the right in Poe Mill is the coal-chute track. The distance between the cloth-room track switch and the coal-chute track switch, approximately, would be about 60 or 65 feet, or something like that. I haven't measured it. From where the coal-trestle switch to the switch of the house track back into the main line north of Poe Mill, from here to here, this distance I would judge is about 75 yards. When I put the Rock Island car on that house lead that was the only car I could get on there without fouling the northbound main line. I could not have gotten two cars on there. To get from the yard I have to cross over somewhere back off this little map, and cross over these two main lines and get on the house lead. This easterly track is the one that I went up. I will show the court where the movement that I have already described was made, to make it applicable to this map. This crossover at the passenger station that comes across there goes from out of the yard and into the house lead. It goes across the southbound and northbound lines into this track, the house lead, you see. And that is what I did. I backed on down through this house lead. I did not use the northbound main at all. I backed into this cloth-room track and this Southern car was sitting here, and we coupled to the car and headed back out to the house lead, and we backed up and threw this switch that goes into the coal chute, and we come in on the coal chute with this car and coupled up the two cars right there, and we headed back out on the lead. The Rock Island was closest to the end of the trestle and the other one is the 'Frisco. I headed back out to the lead. I had all three cars at that time and I set one car. . . After I got out on the lead I shoved back north on the lead, and I went by the coal-trestle track. We come down here and shove directly north from this coal-chute, and put this Rock Island car out here clear of the coal-chute track. That left the Rock Island car clear of the coal-chute track and clear of the main-line track. I uncoupled that car and left it there, and we headed back south with two cars, and backed into the coal-chute track with those two cars and left this 'Frisco car where we got the Rock Island car, and headed back out with the Southern car coupled up to the Rock Island car, and went right down through the house, and left them

on No. 1 in the yard. On this night and on this occasion I did not have any duties to perform outside of the switching yards."

The issue of jurisdiction was made by the defendant by its plea in abatement, and the burden of proof was on the defendant to establish the truth of two allegations: 1. That the plaintiff was a non-resident of Georgia, and 2, that the operation of the engine by which the plaintiff was alleged to have been injured was not connected with and bore no reasonable relation to its business in Georgia. Assuming for the sake of argument that the evidence showed the plaintiff was a non-resident, a question which we do not now decide, it did not show that the operation of the engine at the time in question was not connected with the business of the defendant in Georgia. If the Southern car was ultimately destined to a point in Georgia the operation in question was connected with the defendant's business in Georgia, as we shall presently show. If it was simply to pass through Georgia on into another State the operation would not involve the defendant's business in Georgia. The evidence does not show what the final destination of the car was. It only showed that the car was destined to Atlanta *or* a point south of Atlanta. In order for the defendant to prevail on its plea it was necessary for it to show that the car was destined to a point outside the State of Georgia. Since it did not show such a fact to be true it did not carry its burden, and it was error for the court to hold that the cause of action was a transitory one.

It is argued by the defendant that the presence of the Southern car, attached to the engine, was merely incidental matter, and that the injury did not occur while the Southern car was being attached to the engine. It is true that the injury occurred after the Southern car was attached to the engine, but it occurred while the engineer was in the act of moving it to a place where it was to be attached to another train and sent to its destination. Another car also had to be picked up. Picking up the two cars on the same operation was to the advantage of the defendant in the saving of time, and to require the defendant to make two complete and separate operations in order to place two cars would be highly useless and impractical. The operations to all intents and purposes were one operation, and if one of its purposes was to place the Southern car where it could be sent to Georgia it rendered the transaction one in which the defendant would be engaged involving directly its

business in Georgia. Of course, if the Southern car had been merely attached to the engine and was eventually to be sent to Georgia, but was not at the time being placed so as to be sent to Georgia, the contention of the defendant would be correct. But such is not the case. Under the above rulings and under the rulings in *Reeves* v. *Southern Ry. Co.*, 121 *Ga.* 561 (49 S. E. 674, 70 L. R. A. 513, 2 Ann. Cas. 207), *Louisiana State Rice Milling Co.* v. *Mente*, 173 *Ga.* 1 (159 S. E. 497), and *McCorkle* v. *Pullman Co.*, 60 *Ga. App.* 879 (5 S. E. 2d, 382), the court erred in sustaining the plea to the jurisdiction and in dismissing the action.

*Judgment reversed. Sutton, J., concurs.*

STEPHENS, P. J., concurring specially. I concur in the conclusion that the courts of Georgia have jurisdiction to entertain this suit against the Southern Railway, a non-resident of the State of Georgia, on a cause of action arising in another State. I concur on the ground that the cause of action is transitory, and that suit can be maintained in a State court having jurisdiction of the subject-matter where the defendant is found in the State of Georgia and has been served. A corporation, as an individual, when found within the jurisdiction of the State, may be sued in personam in the courts of that State, by either a resident or a non-resident, on a cause of action arising in another State, where the defendant is found in this State and service is legally perfected. A corporation, being a fictitious person, is a resident only of the State in which it was created and chartered. It is present in another State, as stated in *Reeves* v. *Southern Railway Co.*, 121 *Ga.* 561, 565 (supra), "in any place where its officers or agents transact business in behalf of the corporation under authority conferred by it." Where a corporation chartered in another State comes into Georgia and transacts business therein within the purview of its charter powers it is present in this State, and is subject to be sued in personam in the courts of this State on a transitory cause of action arising in another State. It is not essential to the jurisdiction of the courts of this State, to entertain a suit against a non-resident corporation which is present within this State, that the particular cause of action arose out of business transacted within this State, or that it bore some relation to business transacted within this State. This, as I understand, is the rule laid down in *Reeves* v. *Southern Railway Co.*, supra. In that case it was held that a tort

committed in another State by the Southern Railway Company, a foreign corporation, could be the basis of a suit brought against the corporation in this State where the corporation is present in this State, irrespectively of whether the particular cause of action grew out of any matter involving a transaction or having any relation to business transacted within this State. While the cause of action in that case was based on a tort consisting of an injury in the State of Alabama to a horse which was being transported by the defendant from Missouri to Georgia, the court did not predicate its decision on the ground that the particular cause of action involved the transaction of any business within the State of Georgia. The court eliminated this feature by stating: "The petition did not allege that the contract of transportation was made by any officer or agent of the corporation in Georgia, or that the tort was connected in any way with orders issued by a Georgia officer or from a Georgia office of the corporation." While the court in that decision did not expressly hold that it was not necessary that the cause of action sued on should arise out of or bear some relation to business transacted in this State, it recognized this as the rule. This case therefore is authority for the proposition that where suit is brought in this State by a non-resident against a non-resident corporation doing business in this State, on a transitory cause of action arising in another State, the suit is maintainable, notwithstanding the cause of action did not arise out of any business transacted, and bore no relationship to business transacted, within this State. If there is anything to the contrary in *Louisiana State Rice Milling Co.* v. *Mente*, 173 *Ga.* 1 (supra), or in *McCorkle* v. *Pullman Co.*, 60 *Ga. App.* 879 (supra), these decisions, neither of which was by a full bench, and one of which was by the Court of Appeals, must yield to the former full-bench decision in *Reeves* v. *Southern Railway Co.*, supra.

In *Hawkins* v. *Fidelity & Casualty Co.*, 123 *Ga.* 722 (51 S. E. 724), which is based on *Reeves* v. *Southern Railway Co.*, supra, it was held that a foreign corporation doing business in this State could be sued on a transitory cause of action which originated in another State, the cause of action being in favor of a non-resident of this State, against a foreign corporation doing business in this State, to recover on a policy of insurance on the life of the insured issued outside the State of Georgia, to the insured who afterwards

304

died in Oklahoma Territory. In that case the cause of action arose out of no business transacted in the State of Georgia, and bore no relationship to any business transacted in this State. See my dissenting opinion in the *McCorkle* case; also 32 A. L. R. 61 et seq., note. I am of the opinion that, under either rule, the Georgia court has jurisdiction. I concur in the judgment of reversal, but not in all the conclusions contained in the opinion of Judge Felton.